IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| JOE HOLMES, | ) | |
| | ) | CASE NO. CV 03-514-S-EJL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| IDAHO POWER COMPANY SECURITY | ) | |
| PLAN FOR SENIOR MANAGEMENT | ) | |
| EMPLOYEES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Joe Holmes ("Holmes") filed this action against Defendant Idaho Power

Company Security Plan for Senior Management Employees ("the Plan") under the Employment

Retirement Income Security Act ("ERISA") in an effort to enforce a claim to future benefits

under an unfunded, "top hat" ERISA Plan.  On January 25, 2005,  Holmes filed this Motion for

Summary Judgment (Docket No. 30).  In response to Plantiff's Motion for Summary Judgment,

Defendants request that the motion be denied and that the Court find that the Defendant acted

**Report and Recommendation - Page 1**

properly and that judgment be entered in favor of the Defendant.[1]  Defendant has also filed a

Motion to Strike Second Affidavit of Joe Holmes in Support of Motion for Summary Judgment

(Docket No. 49), on March 9, 2005.  Having heard oral argument and reviewed all the relevant

documents, papers, and memoranda, the Court makes its Report and Recommendation as

follows.

## REPORT

### I.
### Background.

Holmes was initially recruited by Idaho Power Company ("Idaho Power") in early 1997.

(Holmes Aff., ¶ 2.)  When he began his employment with Idaho Power, Holmes also became a

participant with the Administrative Committee for Idaho Power Company's Plan for Senior

Management Employees ("Plan"), the Plan at issue in this case.  Holmes was then transferred to

IDACORP Energy L.P. ("IDACORP Energy") in June of 2001.  (Holmes Aff., ¶ 4.)  IDACORP

Energy was created in 1997 as a separate affiliate from Idaho Power. (Ex. N to Lynn Aff.)  Both

Idaho Power and IDACORP Energy are subsidiaries of IDACORP INC, which was formed as a

holding company in 1998. (Ex. F, pp. 7,8 to Lynn Aff.)  Before his transfer to IDACORP

Energy, Holmes worked as an Idaho Power senior manager responsible for utility and non-utility

operations.  (Holmes Aff,. ¶ 2.)

When Holmes transferred to IDACORP Energy, it was his understanding that his benefits

status would not change under the Plan, nor did he receive notice of any such change, either

---

[1]Cases interpreting Federal Rule of Civil Procedure 56 allow the Court to enter summary judgment for a non-moving party when there are no issues of material fact and the non-moving party is entitled to judgment as a matter of law.  *Cool Fuel, Inc. V. Connett,* 685 F.2d 309, 311, *citing* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2720 (2d 1990).

prior to or after moving to IDACORP Energy.  (Holmes Aff., ¶ 5.)  However, because his work

at Idaho Power and IDACORP Energy involved "deregulated activity" (meaning certain energy

business activities deregulated by the Federal Energy Regulatory Commission), the incentive or

bonus aspect of Holmes' compensation package at Idaho Power and IDACORP Energy

substantially increased to encourage his efforts to develop new marketing strategies.  (Holmes

Aff., ¶ 7.)  Unlike those managers involved in regulated activity, Holmes' incentive

compensation was not capped.  (Holmes Aff., ¶ 7.)  His incentive package for the years 2000 and

2001 amounted to approximately $800,000 each year due to his success in developing

deregulated markets.  (Holmes Aff., ¶ ¶ 7-10.)  In fact, according to Holmes, the bonuses that he

earned were substantially higher than those earned by LaMont Keen, the President of Idaho

Power.   Holmes also states that his incentive pay reflected an increase in Idaho Power and

IDACORP Energy earnings, which contributed to the bottom line earnings of IDACORP Inc.,

the holding company for both business entities.  (Holmes Aff., ¶ 10.)  At different times he was

approached by various third-party recruiters to interview for positions with other companies, but

he declined these interviews because, in his words, his "knowledge of the Plan's reward for

loyalty."  (Holmes Aff., ¶ 11.)

In 2002, IDACORP Inc. made a decision to get out of the unregulated energy business

and to wind down IDACORP Energy, and Holmes was terminated as a result.  (Holmes Aff.,

¶ 11.)  At the time of his termination, Holmes was 48 years old.  Upon his termination, Holmes

sought benefits under the Plan.  (Holmes Aff., ¶ 11.) When the Administrative Committee

calculated Holmes's benefits under the Plan, they included an Early Termination Reduction

Factor ("ETF")(Plan § 6.4), which substantially reduced Holmes's benefits.  (Holmes Aff., ¶ 12.)

**Report and Recommendation - Page 3**

Plan § 6.4 applies to any vested participant, who "terminates employment prior to Retirement or death." Holmes maintains this Section should not apply to him because he did not "terminate" his employment; rather, he was involuntarily terminated during a restructuring in August, 2002. (Holmes Aff., ¶¶ 14-15.) Because of his involuntary termination as a result of the restructuring, Holmes argues his benefits should have been determined under § 6.5, which applies to employees terminated during a "Change in Control" period. (Holmes Aff., ¶ 16.)

Holmes' claim hinges on whether the Administrative Committee's decision to impose the Early Termination Factor under Plan § 6.4 to Mr. Holmes' future benefits represents a proper and consistent interpretation of the Plan as opposed to one which is arbitrary, capricious and unreasonable. Holmes appealed the decision to impose § 6.4 Early Termination Factor before the Administrative Committee in September, 2002, which the Administrative Committee ultimately denied.

### A. Old Plan

Idaho Power implemented the original version of the Plan for Senior Management Employees ("Plan") in 1979. Since that date, the Plan has undergone significant amendments–the most dramatic of which occurred in 1994. With the 1994 Plan, Idaho Power created an unfunded, "top hat" plan, for which the Participants no longer contribute to a plan fund.[2] There are three provisions in the New Plan, which bear directly on the issues in this case: (1) elimination of the requirement that the Participants contribute to the Plan; (2) elimination of a minimum service requirement; and (3) and the addition of § 6.4, Early Termination benefits. Because some Participants had vested benefits under the pre-1994 version of the Plan, the Plan

_____

[2]Technically, Holmes falls under the amendments made in 1996 to the New Plan; however, since none of those amendments are germane to the issues of this case, the Court will refer to the 1994 amendments.

**Report and Recommendation - Page 4**

drafters included a provision establishing a "Frozen" benefit to protect benefits accrued under the pre-1994 Plans.  A Participant  with "Frozen" benefits has the option to select "New" Plan benefits or the old "Frozen" pre-1994 benefits–the Participant may not select a hybrid of the two, but may choose the higher of the two benefits.  Holmes was not vested under the Old Plan.

**B. New Plan**

The "New" Plan provides six types of benefits: (1) benefits paid in connection with certain changes in employment status (§ 3.3); (2) "Survivor Benefits" for beneficiaries of deceased participants (Article V); (3) a "Normal Retirement Benefit" for participants who terminate employment on or after attaining age 62 (§ 6.1); (4) "Early Retirement Benefit" for participants who terminate employment on or after attaining age 55 but prior to age 62 (§ § 6.2 and 6.3); (5) "Early Termination Benefits" for participants who terminate employment prior to attaining age 55 (§ 6.4); and (6) a "Termination After Change in Control" benefits (§ 6.5).

§ 9.1 addresses the administration aspect of the Plan, providing, " this Plan shall be administered by an Administrative Committee which shall consist of not less than three (3) nor more than five (5) persons appointed by the Compensation Committee." (§ 9.1)  At the time of Holmes' administrative appeal, the Committee consisted of three senior officers of IDACORP, Inc. and Idaho Power Company, namely, Jan Packwood, LaMont Keen and Darryl Anderson.[3] § 9.1 also authorizes the Administrative Committee to decide and resolve any and all questions, including interpretations of the Plan.  In addition, the Administrative Committee has the authority to promulgate rules and regulation, which it has never enacted.  Nor have they kept any

---

[3]Mr. Riazzi, the President of IDACORP Energy and Executive Vice President of IDACORP Inc. recused himself.

minutes or documentation of Committee meetings.  Holmes' appeal has been the only claim to

come before the Administrative Committee since the adoption of the 1994 Plan.

### C. Holmes' Appeal Process

Holmes' appeal process began in September 2002, with a letter from his attorney

requesting the Committee to reconsider its decision to impose the Early Termination Reduction

Factor to his benefits.  (Ex. G(1) to Lynn Aff.)  On October 31, 2002, Mr. Keen, a Committee

member, sent a letter denying Holmes' request to recalculate his benefits.  Mr. Keen explained

that the Administrative Committee applied the § 6.4 Early Termination Factor because his

employment terminated before he reached age 55. (Ex. G(2) to Lynn Aff.)  In his response to this

letter, Holmes argued that the Committee's interpretation of the Plan directly contravenes the

express language of § 6.4 and proposed that § 6.5 (Change in Control) more directly pertains to

his situation as he was terminated during the winding down period of IDACORP Energy,

Holmes' employer.  (Ex. G(3) to Lynn Aff.)  Holmes also requested all prior Administrative

Committee decisions supporting its earlier assertion that it had "consistently interpreted the

language 'terminates employment'...to include termination of employment by the Participant's

employer or by the Participant."  *Id.*  Idaho Power refused to provide the information requested

with respect to "similarly situated" employees who had received the Early Termination Factor

reduction due to confidentiality concerns, but did grant Holmes the opportunity to schedule a

hearing date to argue his appeal before the Committee.  (Ex. G(6) to Lynn Aff.)  Eventually

Idaho Power provided redacted copies of correspondence and calculations for all former Senior

Management Plan participants who terminated involuntarily prior to age 55 since December, 1,

1994, but did not include any documentation regarding participants who left employment during

**Report and Recommendation - Page 6**

the 1995/1996 reorganization based on the assertion that these participants' circumstances differed significantly from those of Mr. Holmes.  (Ex. G(9) to Lynn Aff; (Ex. G(11) to Lynn Aff.)

During the hearing, Holmes was provided 30 minutes to present all information and evidence he believed would be relevant to the Committee's review of his benefit calculations. Holmes was not allowed to ask the Committee any questions regarding its initial denial of Holmes' claim or otherwise respond to his questions regarding its decision or interpretation of the Plan.  After the hearing, the Administrative Committee affirmed its decision to apply the § 6.4 Early Termination Factor to Holmes' benefits in its final determination letter dated June 9, 2003.  (Ex. G(13) to Lynn Aff.)  In justifying its decision to deny Holmes' appeal, the Committee cited the following reasons in its final determination letter.  First, the Committee noted that the Plan only provides for six types of benefits and then proceeded to list each of those six benefits and why Holmes' claim for benefits did not fall within the purview of any of these six sections apart from § 6.4.[4]  (Ex. G(13) to Lynn Aff.) This final decision engendered the present litigation, resulting in this Motion for Summary Judgment now pending before the Court.

---

[4] Specifically, the Committee's letter stated the following:

> Mr Holmes was 48 years old when his employment was terminated and, thus, he had not attained either the "Early Retirement Date" (as defined in Section 2.12 of the Plan) or the "Normal Retirement Date" (as defined in Section 2.18 of the Plan).  Mr. Holmes did not experience a change in employment status (as that term is used in Section 3.3 of the Plan), he did not die prior to termination of employment and, thus, his beneficiaries are not entitled to survivor benefits under Article V, and his employment was not terminated within a "Change in Control Period" (as defined in Section 2.6 of the Plan).  Accordingly, the only Plan benefit applicable to Mr. Holmes' situation is Section 6.4. To interpret the Plan as entitling Mr. Holmes to a benefit other than pursuant Section 6.4 would be inconsistent with the terms, design, and intent of the Plan.  (Ex. G(13) to Lynn Aff.)

**II.**
**Analysis**

**A.  Motion to Strike Second Affidavit of Joe Holmes**

As a preliminary matter, the Court will first address Defendant's Motion to Strike the Second Affidavit of Joe Holmes, which is attached to Holmes' Reply Memorandum in Support of his Motion for Summary Judgement.  Defendant Plan contends that Holmes has improperly submitted his second affidavit to his Reply Brief, as neither Rule 56 of the Federal Rules of Civil Procedure, nor Rule 7.1 of the Local Rules of Civil Practice before the United States District Court for the District of Idaho, provides for the submission of an affidavit in reply to a nonmoving party's opposition to a Motion for Summary Judgment.  Although Federal Rule of Civil Procedure 56(e) does permit "supplemental" or "further" affidavits at the Court's discretion, Holmes has not sought leave of Court to file his Second Affidavit and Local Rule 7.1(b)(2)  provides that all affidavits in support of a motion for summary judgment must be served with the motion.  The purpose of this rule is to ensure that the nonmoving party is given the opportunity to respond to any evidence submitted by the moving party.  As a result of Holmes' late submission, the Defendant Plan has been denied this opportunity.  Accordingly, the Court recommends Defendant's Motion to Strike Second Affidavit of Joe Holmes be granted.

**II. Motion for Summary Judgment**

**A. Standard of Review**

ERISA establishes a right to judicial review of benefits decisions, and while Rule 56 of the  Federal Rules of Civil Procedure generally governs motions for summary judgment, in ERISA cases, "a motion for summary judgment is merely the conduit to bring the legal question

before the district court, and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir. 1999). Instead, a district court will review a denial of benefits challenged under ERISA *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If a benefit plan gives the administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the court will review the exercise of that discretion to deny benefits under an abuse of discretion standard. *Id.* Yet, in establishing the standard of review in such cases as abuse of discretion, the Supreme Court also recognized that when an administrator or fiduciary is operating under a conflict of interest,, "that conflict [of interest] must be weighed as a 'factor in determining whether there is an abuse of discretion'." *Snow v. Standard Ins. Co.,* 87 F.3d 327, 330 (9th Cir. 1996), *quoting Firestone,* 489 U.S. at 115. A review where such a conflict of interest exists is "less deferential" although still for abuse of discretion. *See Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc.,* 125 F.3d 794, 798 (9th Cir. 1997), *citing Snow,* 87 F.3d at 331.

In this case, an apparent conflict exists because Idaho Power, as the administrator of the Plan, also funds the Plan. *See Hensley v. Northwest Permanente P.C. Retirement Plan & Trust*, 258 F.3d 986 (9th Cir. 2001), *citing Friedrich v. Intel Corp.,* 181 F.3d 1105, 1109 (9th Cir. 1999). In cases which the beneficiary alleges that the administrator has a conflict of interest, the Ninth Circuit follows a two-part test to determine whether to apply a heightened level of scrutiny in

reviewing the administrator's benefit decisions.  *Atwood v. Newmont Gold Co.,* 45 F.3d 1317,

1322 (9th Cir. 1995).  In  *Atwood*, the court described the test as follows:

> First, we must determine whether the affected beneficiary has provided material,
> probative evidence, beyond the mere fact of the apparent conflict, tending to show that
> the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to
> the beneficiary.  If not, we apply our traditional abuse of discretion review.  On the other
> hand, if the beneficiary *has* made the required showing, the principles of trust law require
> us to act very skeptically in deferring to the discretion of an administrator who appears to
> have committed a breach of fiduciary duty.  *Id.* at 1322.

Once the beneficiary has come forward with evidence that an apparent conflict exists, then the

plan administrators have the opportunity to rebut the presumption by producing evidence which

shows that a conflict of interest did not affect its decision to deny or terminate benefits.  *See*

*Lang,* 125 F.3d at 798, *citing Snow,* 87 F.3d at 331.  If the plan administrator fails to carry its

burden, the court will review its decision *de novo.  Id.*

Moreover, once a court determines that the *de novo* standard of review applies, it is

within its discretion to consider evidence outside the administrative record.  *Mongeluzo v. Baxter*

*Travenol Long Term Disability Ben. Plan,* 46 F.3d 938 (9th Cir. 1995) (holding that new

evidence that was not before ERISA benefits plan administrator may be considered under certain

circumstances upon *de novo* review of the plan administrator's decision to deny benefits); *see*

*also, Dishman v. UNUM Life Ins. Co. of America*, 269 F.3d 974 (9th Cir. 2001) (a district court

may, in its discretion, allow evidence that was not before the ERISA plan administrator when

circumstances clearly establish that additional evidence is necessary to conduct an adequate *de*

*novo* review of the benefit decision); *Ingram v. Martin Marietta Long Term Disability Income*

*Plan for Salaried Employees of Transferred GE Operations,* 244 F.3d 1109 (9th Cir. 2001).

**Report and Recommendation - Page 10**

In support of his contention that a serious and actual conflict affected the Administrative Committee's decision to apply § 6.4, Holmes alleges that the Administrative Committee arbitrarily decided to reduce Holmes' benefits by applying § 6.4 rather than § 6.5 because they felt Holmes earned excessive bonuses as compared to other Idaho Power senior managers and the Idaho Power senior managers who were laid-off in 1995/1996.  Holmes further alleges that the Administrators' decision to apply the § 6.4 Early Termination Factor to his benefits was inconsistent with their application of § 6.4 to other similarly situated employees.  From this alleged inconsistency and the allegation that the Administrative Committee believed Holmes earned too much money, Holmes asks the Court to infer that the Administrators' decision to calculate his benefits under § 6.4 was tainted by self-interest.

Although Holmes has produced evidence that an apparent conflict exists because Idaho Power is responsible for funding as well as administering the Plan, Mr. Holmes has not come forward with 'material and probative' evidence that the *unfunded nature* of the Plan affected the Administrative Committee's decision to reduce Holmes' benefits by imposing the § 6.4 Early Termination Factor.  First, it should be noted that despite the fact the Plan is technically "unfunded," Idaho Power has created an irrevocable trust with assets estimated to be worth $50 million that has been specifically designated to be the source of funding for benefits administered under the Plan.  Given that such a trust exists, this weakens Holmes' argument that even an apparent conflict exists.  Furthermore, the Administrative Committee's decisions in the past do not suggest that it has routinely denied or reduced benefits in order to protect or increase Idaho Power's profits.  Rather, it appears the Administrative Committee has, on occasion, chosen to suspend the application of the § 6.4 ETF for employees who have terminated before reaching

age 55, which has the practical effect of increasing the amount paid out of the fund for employees.  Such behavior does not coincide with an allegation that the Administrative Committee base their benefits decisions with the intent to protect Idaho Power's profit margin. In light of Holmes' failure to present the necessary 'material and probative' evidence that an actual conflict exists, the Court will review the Plan's decision to reduce Holmes' benefits under the abuse of discretion standard.

### B. Abuse of Discretion

Holmes presents three primary arguments as to why the Plan's decision to impose the § 6.4 Early Termination Factor was arbitrary and capricious or an abuse of discretion:[5] (1) that the Administrative Committee arbitrarily decided not to calculate Holmes' benefits under § 6.5 "Change in Control;" (2) that the Plan Administrator's application of § 6.4 to Holmes is inconsistent with the Plan's purpose and plain language of § 6.4; and (3) that the Administrators have inconsistently applied § 6.4 to other similarly situated employees.

The abuse of discretion standard of review requires the district court to give substantial deference to an administrator's decision.  If there is *any* reasonably basis for an administrator's decision, it is not arbitrary or an abuse of discretion. *Horan v. Kaiser Steel Retirement Plan,* 947 F.2d 1412, 1417 (9th Cir. 1991).  Accordingly, a court may overturn a decision only where it is "so patently arbitrary and unreasonable as to lack foundation in factual basis and/or authority in governing case or statute law." *Hensley v. Northwest Permanent P.C. Retirement Plan & Trust,* 258 F.3d 986, 1001 (9th Cir. 2001), *quoting Oster v. Barco of Cal. Employees' Ret. Plan,* 869 F.2d 1215, 1219 (9th Cir. 1988) (internal quotation marks omitted).   Nor may a court substitute

---

[5]Although some courts refer to the arbitrary and capricious standard and others to abuse of discretion, there difference is in name only.

its own judgment for that of the administrator *unless* the ERISA plan administrators have rendered their decisions without any explanation, or construed provisions of the plan in a way that conflicts with the plain language of the plan. *Bendixen,* 185 F.3d at 944. "[A]n administrator also abuses its discretion if it relies on clearly erroneous findings of fact in making benefit determinations." *Taft v. Equitable Life Assurance Society,* 9 F.3d 1469, 1472-73 (9th Cir. 1993)(citations omitted). When the evidence before the administrator conflicts, decisions which directly contravene some evidence in the record do not necessarily amount to an abuse of discretion. *Benedixen,* 185 F.3d at 944; *see also Taft,* 9 F.3d at 1472-1473 .

### 1. Change in Control

The Administrative Committee's determination that the winding down of IDACORP Energy did not constitute a "Change in Control" as defined in the Plan – which served as the basis for its decision not to calculate Holmes benefits under § 6.5– did not amount to an abuse of discretion. The Plan defines "Change in Control" as the "plan of liquidation or dissolution of the Company or an agreement for the sale or disposition by the Company...of all or substantially all of the Company's assets...(§ 2.5(f)). Company, in turn, is defined as Idaho Power Company, its successors or assigns. Holmes' contention that IDACORP Energy is an "assign" and, therefore, fits within the definition of "Company" is a forced reading of this provision. It seems unlikely that the Plan drafters intended the § 6.5 "Change in Control" provision to encompass situations where the IDACORP Inc./Idaho Power Company decided to "wind down" a limited liability partnership that had been created to carry out a separate business plan. In fact, interpreting "Change in Control" as requiring the liquidation or dissolution of all of Idaho Power's assets,

rather than merely the winding down of an affiliate, is not only *not* unreasonable, but comports with an everyday understanding of what constitutes a "Change in Control."

### 2. Plain Language of the Plan

The Court must also disregard Holmes' second argument that the application of § 6.4 to his benefits is inconsistent with the language of the Plan.  Holmes advocates a common sense reading of the language in § 6.4–"if a vested Participant terminates"–to mean that the employee must voluntarily terminate his or her employment to fall within this provision.  When read in isolation, the structure and language of § 6.4 do imply an act of volition, suggesting that Holmes' interpretation of § 6.4 is correct.  Ironically, however, Holmes also argues that those employees terminated as a result of performance problems, i.e. "fired," somehow committed an act of volition and, therefore, "voluntarily terminated" his or her employment.  Yet, such a forced reading of the language of § 6.4 also belies a common sense understanding of the phrase, "voluntarily terminated."  Holmes cannot have it both ways–he cannot argue on one hand that § 6.4 should only apply to those employees who voluntarily terminated their employment, i.e. "resigned" and then try to distinguish his situation from those employees terminated for performance reasons and who suffered the Early Termination reduction factor, by suggesting they somehow "voluntarily terminated" their employment, and therefore logically fall within the scope of § 6.4.

In fact, none of the Plan provisions distinguish between those employees who voluntarily terminate and those who involuntarily terminate.  Therefore, the Court will defer to the Administrative Committee's interpretation of the phrase "terminates employment" as applying equally to all employees, regardless of whether they voluntarily terminate their employment,

**Report and Recommendation - Page 14**

involuntarily terminate for performance reasons, or involuntarily terminate due to a company restructuring or reorganization as such an interpretation is not unreasonable when the Plan is read as a whole.  If the Court required the Plan to use a "judicially-crafted definition," then it would be inappropriately depriving the Plan Administrators of their discretion to interpret their Plan.  *See Hensley,* 258 F.3d 986, 1000 (refusing to find that the plan administrators abused their discretion by utilizing a W-2 definition of employee, rather than adopted a federal common law definition of the term).  The Court agrees with Homes that the word "terminate" may be considered by some as connoting an involuntary act when used in the employment context.  However, it can have a broader interpretation.  Third New International Dictionary also defines "terminate" as to "discontinue the employment of."  Third New International Dictionary (1971).  It is not unreasonable for the Administrative Committee to interpret the word "terminate" to encompass all situations where an employee has discontinued his or her employment, whether voluntarily or involuntarily

### 3. Consistency of Application

Lastly, the Court will consider Holmes' final argument–that the Administrative Committee's inconsistent application of § 6.4 to employees who terminated before age 55 is arbitrary and capricious.  As evidence of the Administrators' inconsistent application of § 6.4, Holmes first directs the Court's attention to the Administrative Committee's decision not to apply § 6.4 to those employees under the age of 55 who voluntarily or involuntarily terminated during the 1995/1996 restructuring of Idaho Power.  The Court, however, does not find any inconsistency in the decision to waive the application of § 6.4 for those Participants terminated in the 1995/1996 lay off and the decision to apply § 6.4 to Holmes' benefits, as the situation of

**Report and Recommendation - Page 15**

the 1995/1996 lay off group was not analogous to that of Mr. Holmes.  Indeed, this Court previously found in its Order addressing Plaintiff's Motion to Compel that the situation pertaining to the determination of benefits for the Participants terminated in the 1995/1996 lay off did not directly bear on Holmes' situation, and is not relevant to this matter.

In fact, the Administrative Committee did not even make the decision not to apply § 6.4 to the 1995/1996 class of employees–Idaho Power's Board of Directors, as authorized under § 11.1 of the Plan, approved the one-time suspension of § 6.4 for members of the 1995/1996 class in order to counteract the perception that there would be a difference in benefits to Participants vested in both the Old Plan and the New Plan, which could have acted as a disincentive for senior management employees to leave Idaho Power voluntarily.  Although the Board never passed a specific amendment suspending § 6.4 for these employees, Dan Minor, who served as Secretary to the Compensation Committee of the Board of Directors ("Compensation Committee"), made a presentation to the Board of Directors entitled "Human Resources reengineering matters" in May 1995, discussing the Reorganization Plan including the proposed separation component of the Reorganization Plan.  In his presentation, he also included a proposal to the Board, recommending the adoption of a one-time suspension of the Early Termination Reduction Factor in § 6.4 of the New Plan for Participants affected by the Reorganization Plan.  At that meeting, the Board voted to implement the Reorganization Plan, which Idaho Power has represented included the "separation component" and one-time suspension of § 6.4.  Given the marked contrasts between his situation and that of the 1995/1996 class, Holmes' attempt to draw a comparison between the two fails to demonstrate the Administrators have inconsistently interpreted the Plan.

**Report and Recommendation - Page 16**

Holmes, however, cites other alleged inconsistencies in the Administrative Committee's application of § 6.4 to employees terminated before the age of 55, which he contends demonstrate that the Committee has arbitrarily and capriciously applied § 6.4 throughout the New Plan's short history.  As noted above, the Administrative Committee's purported rationale for calculating Holmes' benefits under § 6.4 is that his employment terminated before he reached age 55.  Following the Administrative Committee's own reasoning to its logical end, then all employees with "vested"[6] benefits under the Senior Management Plan who terminate before age 55 should have their benefits reduced by the § 6.4 Early Termination Factor barring a formal amendment to the Plan or a decision by the Board to suspend § 6.4.  Any other result would be arbitrary and capricious.

At first blush, because of all the different variable that may apply as to each employee, i.e. age at retirement, length of service, vested under the Old Plan, etc., it is not easy to discern if Holmes is correct in his position that he was treated differently than other similarly situated employees.  However, a review of the employees terminated before age 55 with vested benefits under the New Plan indicates that the Administrative Committee had developed an objective standard in applying  § 6.4.

The Court has prepared a chart,[7] attached as an Appendix I to the Report and Recommendation, which includes information relating to the termination of all those employees cited in Holmes' brief as purported evidence of other "inconsistencies" in the Plan's

---

[6]  While the term "vested" is contained in the clause "vested Participant terminates employment" in § 6.4, the Court agrees with Defendant's position that the word was used inadvertently as every participant under the New Plan is immediately vested as opposed to the Old Plan that had a significant vesting period.  (Minor Aff., ¶ 12)

[7]The Court based its chart on the data included in charts prepared by counsel attached as Exs. A(1) and A(2) to Plaintiff's Memorandum in Support of Summary Judgment.  (Sealed Document, Docket No. 34.)

interpretation.  The chart includes the employee's age at the time of termination, the date of termination, whether the termination was voluntary or involuntary, whether the employee had Frozen Benefits under the Old Plan, and whether the § 6.4 Reduction Factor was imposed.  This chart demonstrates that the Plan Administrators have consistently interpreted the Plan, with perhaps only one minor deviation, when deciding whether to apply the § 6.4 Early Termination Factor to an employee's benefits.

This closer inspection of the evidence reveals that the Administrative Committee has consistently suspended § 6.4 for Plan Participants who had "Frozen" benefits under the Old Plan and/or had a lengthy term of service with the utility.  Conversely, when a Plan Participant did not have "Frozen" benefits under the Old Plan, nor a lengthy term of service, the Administrative Committee applied § 6.4.  For example, the Administrative Committee suspended § 6.4 when calculating the benefits for Participants # 81115, 95026, 43540 and 68725,[8] all of whom had either or both vested benefits under the Old Plan and/or a lengthy term of service.  The remaining employees referred to in Holmes' brief as examples of inconsistencies in the Plan administration, including # 77725, 43273, 91096, and 95026, did receive the § 6.4 reduction. None of these Participants had vested benefits in the Old Plan with the exception of 91096, who was terminated in 1995 and who only had approximately five years vested under the New Plan.

Therefore, Holmes may not draw parallels between himself and those employees who had vested benefits under the Old Plan and/or who have fulfilled a lengthy term of service with Idaho Power because his situation is not sufficiently similar to make this comparison.  A plan

---

[8]In fact, Employee # 43540 and 68725, both of whom had more than 30 years of service, should not even be included in the analysis because the New Plan was amended and restated effective December 1, 2002 to allow Participants who had completed 30 years of service with Idaho Power but who had not yet attained the age of 55 to be eligible for Early Retirement benefits under the New Plan. In light of this amendment, § 6.4 could not be applied.

**Report and Recommendation - Page 18**

administrator may draw such distinctions among employees as long as it does so consistently, which has occurred in this case.  The Ninth Circuit has held that a consistent pattern of interpretation is "significant evidence" that the plan administrator acted reasonably.  *Hensley,* 258 F.3d at 1002, *citing McDaniel v. Chevron Corp.,* 203 F.3d 1099, 113 (9th Cir. 2000) and *Hansen v. Western Greyhound Ret. Plan,* 859 F.2d 779, 781 (9th Cir. 1988); *see also* James E. Jordan et al., *Handbook on ERISA Litigation,* § 4-61 (1999 Supp.).  In exercising their wide discretion to suspend § 6.4 in certain situations, the Administrative Committee did not make any clearly erroneous findings of fact, nor construe the plan provisions in a way that conflicts with the plain language of the Plan.  Nor were the Plan Administrators' decisions "so patently arbitrary and unreasonable as to lack foundation in factual basis and/or authority in governing case or statute law."  Accordingly, the Court recommends that Holmes' Motion for Summary Judgment should be denied.

The Court further recommends that summary judgment be granted in favor of the Defendant Plan even though it has not filed a formal cross-motion for summary judgment.   The Court believes this is a situation where it is appropriate to enter summary judgment for the nonmoving party.  The parties do not dispute the relevant facts, rather, Holmes only disputes the Plan's interpretation of those facts.  However, given the Court's recommendation was based on a question of law– whether the Plan Administrators' interpretation of the Plan and all the relevant facts was arbitrary and capricious– the Court will recommend summary judgment in the Plan's favor.

**Report and Recommendation - Page 19**

## **RECOMMENDATION**

Based upon the foregoing, the Court being otherwise fully advised in the premises, the Court **hereby RECOMMENDS that** Plaintiff's Motion for Summary Judgment (Docket No. 30), filed on January 25, 2005, be DENIED.

The Court **further RECOMMENDS that** summary judgment be granted in favor of Defendant Idaho Power Company Security Plan for Senior Management Employees.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

DATED:  **May 31, 2005**

Honorable Mikel H. Williams
United States Magistrate Judge

# APPENDIX I

| Employee # | Voluntary or Involuntary | Year of Termination from the Plan | Age at Termination | Time in the Plan for Senior Management Employees (Approx.) | Frozen Benefits in Old Plan | Application of § 6.4 and Defendants Rationale |
|---|---|---|---|---|---|---|
| *Plaintiff Holmes* | *Involuntary. Lay off from IDACORP Energy.* | *2002* | *48 years old* | *5 years* | *No* | *Yes. Terminated before age 55.* |
| *77725* | *Involuntary. Lay off from IDACORP Energy* | *2003* | *48  years old* | *6 years* | *No* | *Yes. Terminated before age 55; separation agreement.* |
| *43273* | *Involuntary. Performance issues* | *2000* | *51 years old* | *10.5 years* | *No* | *Yes. Terminated before age 55.* |
| *91096* | *Involuntary. Performance issues* | *1995* | *48 years old* | *5 years* | *Yes* | *Yes. Terminated before age 55.* |
| *95026* | *Involuntary* | *2003* | *51 years old* | *8 years* | *No* | *Yes. Terminated before age 55; accelerated lump sum distribution of benefits.* |
| *81115* | *Voluntary* | *1999* | *49 years old* | *10 years* | *Yes* | *No. Fully Vested under the Old Plan; lengthy term of service with the utility.* |
| *07710* | *Voluntary* | *Terminated from Plan in 1998 pursuant to § 3.3 Change in Employment Status.* | *53 years old* | *16.5 years* | *Yes* | *No. Fully vested under the Old Plan; lengthy term of service with the utility.* |

**Report and Recommendation - Page 22**